**Affirmed and Memorandum Opinion filed November 2, 2023.**



In The

# Fourteenth Court of Appeals

### NO. 14-23-00343-CV

## IN THE INTEREST OF S.D.H.B., A/K/A S.H., A.N.H., A/K/A A.H., M.E.R.B., A/K/A M.S., AND M.M.R., A/K/A M.R., Children

**On Appeal from the 313th District Court
Harris County, Texas
Trial Court Cause No. 2022-00658J**

## MEMORANDUM OPINION

B.B. ("Mother") appeals the trial court's final order terminating her parental rights to her four minor daughters, S.D.H.B., A.N.H., M.E.R.B., and M.M.R. The trial court terminated Mother's parental rights on predicate grounds of endangerment and failure to comply with the court-ordered service plan for reunification. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O). The trial court further found that the termination of parental rights was in the children's best interest. *See id*. § 161.001(b)(2). In three issues, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's endangerment

findings and its best interest determination. We affirm.

## *Background*

In its final decree, the trial court terminated the parental rights of Mother and the respective fathers to each of the four children. Only Mother has filed an appeal. Mother does not challenge the trial court's finding on the predicate ground of failure to comply with the court-ordered service plan for reunification under Family Code section 161.001(b)(1)(O). As stated, she challenges the trial court's endangerment findings and best interest determination. Although only one predicate finding is required for termination, endangerment findings under subsections D and E are challengeable on appeal regardless of other predicate findings because of the collateral consequences of such findings. *See In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) ("When a parent [challenges an endangerment finding], an appellate court that denies review of [such] a . . . finding deprives the parent of a meaningful appeal and eliminates the parent's only chance for review of a finding that will be binding as to parental rights to other children.").

Trial was held on April 6, 2023. At that time, S.D.H.B. was nine years old, A.N.H. was eight years old, M.E.R.B. was a little over two years old, and M.M.R. was about a year old. Mother lost custody of the children, and this case began, in April 2022, after Mother and M.M.R. tested positive for amphetamine and methamphetamine and M.M.R. tested positive for marijuana while in the hospital for M.M.R.'s birth. The children had therefore been out of Mother's care for almost one year at the time of trial.

According to a Permanency Report prepared by the Texas Department of Family and Protective Services (the "Department") and admitted into evidence, M.M.R. began exhibiting withdrawal symptoms at the hospital and the Department sought temporary managing conservatorship over all four children due to Mother's

history of substance abuse. The children were thereafter placed in foster homes, with the elder two placed in one home together and the younger two placed in a different home together. Although the Department's initial goal was return of the children to Mother's custody, that changed in September 2022 due to her failure to engage in recommended services and continuing to test positive for illegal substances. The Department's goal at the time of trial was adoption by unrelated parties. The report also notes that the Department had previously concluded there was reason to believe reports of neglectful supervision by Mother of one or more of the children in February and again in December 2020. But the report contained no details regarding these allegations.

Further, according to the report, S.D.H.B. was diagnosed as having "Adjustment Disorder, with mixed anxiety and depressed mood"; A.N.H. was diagnosed as having "Adjustment Disorder, [with] Depressed mood"; and both of the older girls were to be additionally considered for treatment for suspected child neglect, psychological abuse, and academic problems. The report additionally detailed the services that Mother had been directed to complete and her persistent failure to do so. She was referred three times for a substance abuse assessment before she participated in the assessment, but then she failed to complete the recommended services, including being "unsuccessfully discharged" from group and individual therapy for nonattendance. Mother was referred four times for a psychological evaluation before completing the evaluation. Mother was also referred for a domestic violence assessment three times; on the third referral, she was scheduled to participate on three occasions but failed to participate, and the service was terminated. Mother was referred to parenting classes but did not provide any proof of attendance.

As the report notes, after testing positive for illegal substances in April 2022,

Mother was ordered to undergo monthly random drug testing starting in May 2022. She failed to participate in May, June, July, September, November, January, or February. In August, Mother's urine sample tested positive for marijuana, and her hair sample tested positive for marijuana, amphetamines, and methamphetamines. In October, her urine again tested positive for marijuana, but she did not provide a hair sample. In December, her urine again tested positive for marijuana, and her hair tested positive for marijuana and methamphetamines. The court also ordered additional testing in October and February. She tested positive for marijuana, amphetamines, and methamphetamines in the additional October testing and for marijuana and methamphetamines in the February testing.

Mother was the first witness to testify at trial. She stated that she had a month-to-month lease for an apartment, but she did not intend to stay there long term. She was not currently working and said she needed some help. She was last employed in January 2023 and had received help from a church and was looking into other organizations and charities. She explained that someone had stabbed her in the leg and she was scared to go out and look for work, but she had applied for a job at a check cashing place the month before trial and previously at a wings restaurant. She said that she had $25 in "each" savings account, and when asked how she intended to pay rent, she first said, "I have my little jobs going on." Later, she indicated she was looking into victim compensation. She also stated that when the case began, she was working "side gigs," which apparently included cleaning houses and offices with her sister, cooking food, and working at the NRG complex for a month.

She acknowledged last using marijuana in January but insisted she did not use cocaine and could not recall the last time she used methamphetamine, although she said she knows it was the previous year. She was not sure if her December test

4

had been positive but alleged that if she was tested on the day of trial, the test would be negative, except probably for marijuana. She acknowledged using methamphetamine every month the previous year, including during the pendency of the case, but said it was not every week. She acknowledged that the trial judge had informed her that she could lose her parental rights if she continued to use illegal drugs. She also said that she wants to take those drugs "off the street."

Mother asserted that she had "hit rock bottom" but was no longer in a dark place. She did not want to lose her parental rights and would choose her children over drugs. She said the court should return her children to her because she was not using methamphetamine anymore, takes full responsibility, and had done some research on the issue of drugs. She had been using drugs off-and-on for about three years. She said that she had entered in-patient treatment on the recommendation of a Child Protective Services employee, but she signed herself out after a week because she could not deal with the pressure. She admitted she had been an addict, and when asked what her sobriety plan was, she replied, "Going to church. . . . That's all I'm doing right now." She also stated, however, that she was willing to go back for in-patient treatment "today."

Mother testified that she was common-law married to J.S.R., who is the father of M.E.R.B. He supported the children and paid for their apartment, food, and other stuff. Mother said that all of the children love him. H.H. is the father of the older two girls, and Mother testified that the father of M.M.R. died before she was born.

J.S.R. next testified that he is married to Mother but is currently in jail for domestic violence against her. He explained that they had been drinking and someone had touched Mother and he pushed her into a car and also bit her. Later in his testimony, he also acknowledged hitting her. He admitted to using illegal drugs

the prior year and testing positive for illegal drugs in December but asserted he had not used drugs since then except for marijuana and never used drugs in front of the children. He acknowledged that he had provided support for Mother and the children and that he loved all the children. He has seen Mother since the assault and talks to her, and they have discussed not using drugs anymore. He is concerned about being deported.

The foster mother for the older two girls testified that she and her husband would like to adopt the girls if that becomes an option. She said that they have given the girls the stability the girls did not have before and have provided for all the girls' needs for the last month, including housing; emotional, physical, and medical needs; taking them to school; and making sure they do well in school. The girls thrive with routine, and foster mother and her husband provide that for them. They also provide a nurturing environment. The girls come to her or her husband whenever they need something, and they talk to her when they are unhappy. The girls call her "mommy" or "Ms. Stacy," and they call her husband "Carlos" or "daddy." She believes that staying with her and her husband would be in the girls' best interest, and she promised to make sure they have a normal life. She believes the girls love and trust her and have bonded with her, but she acknowledged the girls also refer to Mother as "mom" and are torn. They know that at some point they will have to say goodbye to one or the other of the women. This fact particularly troubles S.D.H.B.

Foster mother observed two virtual visits between the girls and Mother and said that Mother appeared to be bonded with S.D.H.B., but foster mother was unsure of a bond between Mother and A.N.H. S.D.H.B. receives therapy for two hours a week, and if she asked to see Mother, foster mother said she would follow the advice of a professional. The girls do not like alcohol and do not want foster

mother to drink because of what it did to their parents. The girls told foster mother about a time when H.H. was under the influence and had Mother on the floor and was beating her. S.D.H.B. called 911 because Mother had told the girls to do so if they ever saw H.H. hit her. S.D.H.B. indicated she was scared during the incident. The girls also told foster mother about parties and glass being thrown, about being scared and getting pulled out of a fight, and about someone losing a tooth and the police being called.

Foster mother said that the girls see their sisters every two weeks and are bonded with them. Both foster families have promised to get the girls together as often as possible, indefinitely.

The foster mother for the younger two girls, M.E.R.B. and M.M.R., also testified. She had been caring for the girls since they were removed from Mother's possession. She believes that it is in the girls' best interest to remain in her and her husband's stable home, and they would adopt the girls "in a heartbeat" if that became an option. Both girls are in daycare. Foster mother said that she and her husband calm and soothe the girls when they are sick or crying and provide for their emotional, physical, and medical needs. She wants them to grow up as normal children in a safe and stable environment. She also explained that she has a good relationship with the older girls' foster mother and that both families are committed to raising the four girls as sisters.

The Department's supervisor for the case also testified. She detailed Mother's failure to complete the recommendations from various assessments as also recounted in the Department's permanency report. She said that Mother has not shown any proof of employment during the pendency of the case. Although Mother and J.S.R. have visited the children consistently, at a recent visitation, they appeared to be "under the influence." At another visit within the previous couple of

weeks, Mother had become belligerent with a Department employee. When the supervisor subsequently called Mother about the incident, Mother started the call calmly but then became belligerent again. The supervisor sent someone to conduct a welfare check on Mother because Mother had seemed unstable, but no one answered the door at Mother's apartment. The supervisor has concluded that it is in the best interest of the children to remain with their foster parents and perhaps be adopted.

A Child Advocates employee assigned to the case also testified. She stated that she has regularly visited the homes where the children stay and has spoken with Mother and J.S.R. She believes that it is in the children's best interest to terminate the parents' rights and have the children remain in the foster homes where they have a safe and stable environment in which to thrive. She described the foster homes as two very good homes and the foster mothers as two very good people that meet all of the girls' needs, including their emotional needs. The advocate is "100 percent" happy and satisfied with the placements. She said that the children have "progressed so much. They're doing amazing in school." The older two are in therapy, and the younger two are meeting developmental milestones. The advocate also said that the caregivers have consistently met the children's needs.

The advocate tried to visit Mother's home on numerous occasions, but Mother had not been responsive to the requests. The advocate further noted that Mother had missed one visit with the children, was 45 minutes late to another visit, and had missed important meetings in the case. According to the advocate, Mother also has not shown a clear pattern of recovery in her sobriety. The advocate finds it concerning that Mother still wants to be in a relationship with J.S.R. even though he was in jail for assaulting her. The advocate said that she has observed more than

four of Mother's visits with the children, and although Mother seemed to have a loving bond with S.D.H.B., that did not seem to be the case with the other children. The advocate did, however, notice a bond had formed between the foster parents and the children. The foster parents were affectionate with the children and very attentive to their needs. The record also contains a report prepared by Child Advocates that reflects the conclusions stated by the advocate who testified and also echoes many of the points discussed above from the Department's permanency report.

As indicated above, at the conclusion of the trial, the trial court found that Mother had knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being, engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the children's physical or emotional well-being, and failed to comply with the provisions of a court order establishing the actions necessary for the Mother to obtain the return of the children. The court also found that termination of Mother's parental rights was in the children's best interest and therefore terminated her parental rights. The court appointed the Department as sole managing conservator of the children.

### *Standards of Review*

As mentioned, Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's endangerment findings and its best interest determination. Because of the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support such findings. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as

to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re J.F.C.*, 96 S.W.3d at 264.

In reviewing a legal sufficiency challenge under the clear and convincing evidentiary standard, we examine all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all contrary evidence that a reasonable factfinder could have disbelieved. *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

In reviewing termination findings for factual sufficiency, we consider and weigh all the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. We give due deference to the factfinder's findings and do not substitute our judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). As always, the trier of fact is the sole judge of witness credibility. *See In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re T.L.E.*, 579 S.W.3d 616, 626 (Tex. App.—Houston [14th Dist.] 2019, pet. denied).

### *Endangerment*

In her first two issues, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's endangerment findings under Family Code subsections 161.001(b)(1)(D) and (E). Under these provisions, courts are authorized to terminate parental rights respectively if the parent has "knowingly

placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child" or "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(D), (E). "Endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam). Endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but it is not necessary that conduct was specifically directed at the child or that the child actually suffered injury. *See id.*

Subsections D and E differ principally with respect to the source of the danger to the child. Endangerment under subsection D focuses on evidence of the child's environment, including living conditions and the parent's conduct in the home. *See In re L.E.R.*, No. 14-21-00590-CV, 2022 WL 1088592, at *8–9 (Tex. App.—Houston [14th Dist.] Apr. 12, 2022, no pet.). Under subsection E, the relevant inquiry is whether the endangerment of the child's physical and emotional well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Unlike subsection D, termination under subsection E must be based on more than a single act or omission because the statute requires the parent engage in a voluntary, deliberate, and conscious course of conduct. *Id.* "As a general rule, subjecting children to a life of uncertainty and instability endangers the children's physical and emotional well-being." *In re J.O.A.*, 283 S.W.3d at 345. Under subsection E, courts may consider conduct occurring both before and after the Department removed the child from the home. *In re S.R.*, 452 S.W.3d at 360. Relevant conduct may even occur before the child's birth, while the

parent had custody of older children. *See In re J.O.A.*, 283 S.W.3d at 345.

**Endangerment by conduct.** We will first turn to the evidence relevant to the trial court's endangerment by conduct finding under section 161.001(b)(1)(E). Much of this evidence concerns Mother's use of illegal drugs. As we have previously explained, to be relevant to this analysis, there must be a causal link between a parent's drug use and the endangerment to the child. *In re L.C.L.*, 599 S.W.3d 79, 84–86 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (en banc). The evidence was legally and factually sufficient to establish such a link in this case.

That Mother used illegal drugs, specifically amphetamines, methamphetamines, and marijuana, during her pregnancy with M.M.R. was established by drug testing of both Mother and M.M.R. at the hospital as well as M.M.R.'s subsequent withdrawal symptoms. A mother's drug use during pregnancy is certainly conduct that endangers the physical and emotional well-being of a child *See, e.g.*, *In re I.R.Z.*, No. 14-22-00431-CV, 2022 WL 17491941, at *5 (Tex. App.—Houston [14th Dist.] Dec. 8, 2022, pet. denied) (mem. op.); *In re M.J.*, No. 14-20-00449-CV, 2020 WL 7038526, at *6 (Tex. App.—Houston [14th Dist.] Dec. 1, 2020, no pet.) (mem. op.) This evidence is also relevant in regard to the other children. *See In re P.N.T.*, 580 S.W.3d 331, 356 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (when reviewing an endangerment finding under subsection E, "the parent's treatment of other children must be considered").

Mother's persistent drug use while the children were in her care and after they were removed from her was also established by her own testimony that she had been using illegal drugs for several years and used illegal drugs monthly in 2022, which would include periods both before and after the children were removed in April 2022. The evidence additionally included several failed drug

12

tests and the fact that she failed to participate in numerous drug tests. *See In re E.A.D.*, No. 14-22-00025-CV, 2022 WL 2663981, at *6 (Tex. App.—Houston [14th Dist.] July 11, 2022, no pet.) (mem. op.) ("Continued illegal drug use after a child's removal jeopardizes parental rights and may be considered as establishing an endangering course of conduct."); *Cervantes–Peterson v. Tex. Dep't of Fam. & Protective Servs.*, 221 S.W.3d 244, 253–54 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc); *see also In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("[A] fact finder reasonably can infer that a parent's failure to submit to court-ordered drug tests indicates the parent is avoiding testing because they were using illegal drugs."). Indeed, Mother acknowledged that the judge had previously informed her that she could lose her rights to her children if she continued to do drugs. Additionally, there was testimony that Mother and J.S.R. appeared to be "under the influence" at a visitation with the children. *In re M.T.*, No. 14-22-00198-CV, 2022 WL 3204819, at *8 (Tex. App.—Houston [14th Dist.] Aug. 9, 2022, no pet.) (mem. op.) (considering fact parent appeared to be "under the influence of a substance" during a visit with child as evidence parent engaged in a course of conduct that endangered child's physical or emotional well-being).

Mother contends that the results of the drug tests demonstrate that she had reduced or stopped her drug usage because the results showed a consistent decrease in the amount of the drugs detected over time. Although Mother is correct that the testing shows a decrease, it should also be pointed out that Mother simply failed to appear for most of the required drug testing. As trier of fact, the trial court could have surmised from this either that Mother only appeared for testing when she thought she might test low or negative or that Mother appeared for so little testing that no real trend of decreased usage could be discerned.

There was also other evidence relevant to the endangering conduct analysis. For one, considerable evidence established that Mother failed to complete many of the services that were prerequisites for the return of the children to her care. A failure to complete a court ordered service plan may constitute evidence supporting an endangerment finding because such conduct subjects children to instability and uncertainty, which endangers the children. *In re R.R.A.*, 654 S.W.3d 535, 549 (Tex. App.—Houston [14th Dist.] 2023, pet. granted) (citing *In re C.W.M.P.*, No. 14-20-00571-CV, 2021 WL 244865, *7 (Tex. App.—Houston [14th Dist.] Jan. 26, 2021, pet. denied) (mem. op.), and *In re M.L.G.J.*, No. 14-14-00800-CV, 2015 WL 1402652, *10 (Tex. App.—Houston [14th Dist.] Mar. 24, 2015, no pet.) (mem. op.)); *see also In re M.T.*, 2022 WL 3204819, at *8 (considering failure to participate in services as evidence parent was unwilling to improve parenting skills). Specifically in this case, there was evidence from at least two sources that the three youngest children were not bonded to Mother, likely due to the prolonged absence from her care.

Lastly, evidence that Mother intended to remain in a relationship with J.S.R., despite the fact that he was under arrest for domestic violence against her, is also relevant to the endangerment analysis. *See, e.g.*, *In re D.D.D.*, No. 01-23-00078-CV, 2023 WL 4872399, at *11 (Tex. App.—Houston [1st Dist.] Aug. 1, 2023, no pet.) (mem. op.); *see also In re J.T.*, No. 01-19-00908-CV, 2020 WL 1942463, at *9 (Tex. App.—Houston [1st Dist.] Apr. 23, 2020, pet. denied) (mem. op.) ("[C]ontinued association with a known abuser is a conscious choice that endangers a child's physical and emotional wellbeing because it exposes the child to the possibility of violence.").

Based on the foregoing analysis, the evidence was legally and factually sufficient to support the trial court's predicate finding of endangerment under

section 161.001(b)(1)(E). We therefore need not consider Mother's challenge to the evidence supporting a finding of endangerment under subsection D. *See, e.g.*, *In re P.W.*, 579 S.W.3d 713, 728 (Tex. App.—Houston [14th Dist.] 2019, no pet.). We overrule Mother's first two issues.

### *Best Interest*

We now turn to Mother's third issue challenging the legal and factual sufficiency of the evidence to support the trial court's finding that termination was in the children's best interest. There is a strong presumption that the best interest of a child is served by keeping the child with a parent. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). The party requesting termination bears the heavy burden of rebutting that presumption. *See In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). No specific set of facts is required to establish that termination is in the best interest of a child, but there are several nonexclusive factors that may guide the factfinder's best-interest determination. *See In re L.M.*, 572 S.W.3d 823, 837 (Tex. App.—Houston [14th Dist.] 2019, no pet.). These factors include: (1) the desires of the children; (2) the children's emotional and physical needs now and in the future; (3) the emotional and physical danger to the children now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the children; (6) the plans for the children by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) any acts or omissions of the parent that may indicate the existing parent-child relationships are not appropriate; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re E.R.W.*, 528 S.W.3d at 266; *see also* Tex. Fam. Code § 263.307(b) (listing factors to consider in evaluating a parent's willingness and

15

ability to provide the child with a safe environment). The same evidence used to establish predicate grounds for termination under section 161.001(1) may be probative in determining the best interest of the children. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

**The children's desires.** Neither party has identified any evidence establishing that any of the children had expressed a specific desire to either return to Mother's care or remain with the foster families. There was evidence that at least the oldest child, S.D.H.B., had a loving bond with Mother and the oldest two appeared torn between Mother and their foster mother, but there was no indication of a preference. *See generally In re F.M.E.A.F.*, 572 S.W.3d 716, 732 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (explaining that a child's love for a parent is an important but not controlling best interest factor). As mentioned above, there was also evidence that all of the children were bonded with their foster families.

**Emotional and physical needs.** There was evidence that Mother and J.S.R. loved the children but also that the children had loving relationships with their foster families. There was also evidence that the foster families had been taking care of the children's emotional, physical, medical, and educational needs for the better part of a year and that the children were progressing and doing very well in those homes. The older girls' foster mother also had them in therapy after they had been diagnosed with Adjustment Disorder, among other things, with S.D.H.B. going two hours a week. According to Mother and J.S.R., J.S.R. had been providing financial support for the children prior to his incarceration. It appeared that he planned to do so again should they be reunited, but he also was worried about being deported.

**Emotional and physical danger.** There was significant evidence that

16

Mother had been using illegal drugs for years, which poses a potential danger to the children. *See, e.g., In re E.R.W.*, 528 S.W.3d at 266 ("Mother's history of drug abuse bespeaks a course of conduct that the fact finder reasonably could conclude endangers [child]'s well-being."). J.S.R. also admitted to illegal drug use, and at the time of trial, he was under arrest for domestic assault against Mother. It was apparent that Mother and J.S.R. planned to continue their relationship in the future. *See In re J.T.*, 2020 WL 1942463, at *9 ("The evidence of the mother's . . . continued association with a violent boyfriend . . . bears on the emotional and physical danger to [the child] now and in the future."). There was also evidence that the children had previously been exposed to other violence while in Mother's care, specifically being present when H.H. beat Mother and at a party that apparently involved a fight. There was no evidence of any potential physical danger with the foster families. Regarding emotional danger, the foster mother for the two older girls stated that it was going to be difficult for the children to say goodbye to either Mother or foster mother when the time came to do so.

**Parental abilities.** There was not much evidence admitted concerning Mother's parenting ability, although there was evidence that she repeatedly failed to participate in services she had been offered to make her a better parent and the Department had twice previously concluded that there was reason to believe reports of neglectful supervision. *See In re C.H.*, 89 S.W.3d 17, 27–28 (Tex. 2002) (explaining that historical deficiencies in parenting are relevant to the inquiry). The Department's permanency report also noted that Mother had not demonstrated an ability to provide a safe and nurturing environment and that she yelled at the children, but the report did not offer any further specifics on those points.

The children were said to be doing very well and progressing at a rapid pace in foster care, and as mentioned, the foster parents were consistently providing for

17

all the children's needs, including emotional, physical, medical, and educational. The children reportedly enjoyed doing activities with their foster families.

**Programs available to assist.** Very little evidence was adduced regarding any programs that might be available to assist those seeking custody. Mother stated that she needed help and was looking into receiving charitable assistance and perhaps victim compensation, but she did not offer much in the way of specifics. As also mentioned above, the two older children were in therapy while with their foster mother. Mother also indicated a willingness to return to in-patient treatment for addiction, but she had previously checked herself out of such treatment before completing it and stated that her plan for maintaining sobriety involved simply going to church.

**Plans.** Not much was said regarding Mother's plans for the children. Both foster mothers stated that they and their husbands wanted to adopt the children they were caring for if that became a possibility, and both emphasized that they wanted to raise the girls as sisters and get them together as often as possible. The Department also represented that adoption was the goal for the children. The foster mother for the older girls stated that she and her husband promised to provide the girls with a future and to make sure they go to school and have normal lives. The foster mother for the younger children stated that she and her husband plan to continue providing for the girls' emotional, physical, and medical needs and want them to grow up as normal children.

**Stability.** The stability of the proposed home environment is an important consideration in determining whether termination of parental rights is in the children's best interest. *In re A.G.*, No. 14-18-01089-CV, 2019 WL 2385723, at *5 (Tex. App.—Houston [14th Dist.] June 6, 2019, pet. denied). Mother testified that she was living in an apartment month-to-month, but she struggled to explain how

she would be able to pay the next month's rent. At the time of trial, Mother had been unemployed for several months, but she was looking for assistance and managed to find "little jobs" to get by. Mother apparently intended to again live with J.S.R., but he was currently in jail and was concerned about being deported. When specifically asked how she was planning to support the children, Mother replied, "I have to find a way."

The foster families' homes were described as stable environments where the children thrive in routines and all their needs are consistently met. Among other things, foster mother for the older girls stated that she and her husband provide the girls with a house and a bed and make sure they get to school and do well in school, and foster mother for the younger girls stated that she and her husband make sure the girls go to daycare.

**Acts or omissions and any excuses.** Mother's conduct that might impact the parent-child relationship has already been discussed in detail above: the drug use while pregnant, while having custody of the children, and afterwards when return of the children depended on her not using drugs; the persistent failure to engage in services; and the relationship with J.S.R. and otherwise exposing the children to violence. Mother asserted that she had been ignorant regarding the effects of illegal drug usage but that she had been educating herself. She did not offer any other excuses.

**Conclusion.** On this record, a reasonable factfinder could have formed a firm belief or conviction that termination of Mother's parental rights was in the children's best interest. *See In re J.O.A.*, 283 S.W.3d at 344. Although it is clear from the record that Mother loves the children, it would also have been reasonable for the trial court to conclude that she lacked the ability to provide a safe and stable environment and successfully parent the children. This is supported by the

19

evidence regarding her persistent drug use and inability to participate in services, lack of steady income, and exposing the children to violence. Additionally, the evidence strongly indicates that the children are thriving in their foster families' care, and adoption by the foster families appears to be a logical next step for the children. We overrule Mother's third issue challenging the sufficiency of the evidence to support the trial court's best interest finding under Family Code section 161.001(b)(2).

We affirm the trial court's judgment.


/s/    Frances Bourliot
Justice


Panel consists of Chief Justice Christopher and Justices Bourliot and Hassan.